UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

HEATHER HUNT,

             Plaintiff,

      v.

COUNTY OF WHITMAN, et al.,

             Defendants.

No. CS-03-119-FVS

ORDER

**THIS MATTER** comes before the Court for consideration of several motions.  The plaintiffs are represented by Connie W. Taylor and Paul T. Clark; the defendants by Heather C. Yakely and Hugh T. Lackie.

**I.**

During the late afternoon or early evening of December 7, 2000, Chester Hunt's brother, Henry Hunt, dialed 911 and reported that Chester was despondent, probably intoxicated, armed, and sitting in his pickup truck along a road in Whitman County.  Law enforcement officers located Chester's pickup.  The sun had set; it was cold.  As Henry had indicated, Chester was sitting by himself in the cab.  No one else was near.  He got out of the pickup and pointed a handgun at Morgan Grant, who is employed by the Washington Department of Fish and Wildlife as a law enforcement officer.  Officer Grant retreated to a less exposed position and told Chester to put the handgun down.

ORDER - 1

Chester got back into the cab of the pickup.  A number of other law enforcement officers arrived, including Sheriff Steve Tomson and Sergeant Patrick J. Kelley.  Officer Grant continued talking to Chester in an effort to persuade him to surrender.  Deputy Danielle Steinmetz, who had received training in the art of negotiation, began assisting Officer Grant.  At some point (perhaps before Deputy Steinmetz joined him), Officer Grant persuaded Chester to give up one of his handguns.  After Deputy Steinmetz joined Officer Grant, Chester said, "So, if I come out shooting, I won't make it."  At Deputy Steinmetz's prompting, Officer Grant responded, "That's right."  To which, Chester said something like, "That's what I needed to know."  (Deposition of Danielle Imboden, at 15.[1])  Henry Hunt arrived.  He observed Sergeant Kelley shoot out some, and perhaps all, of the tires of his brother's pickup, thereby preventing Chester from driving away.  In addition, Henry observed negotiations between Chester and the officers.  They arranged for Henry to speak to his brother from a distance.  At his deposition, Henry recalled Chester indicating he "would come out, he'd put his guns down, he just wanted me to come get him.  He didn't care if another officer was with me, he just wanted me there."  (Deposition of Henry Hunt, at 34.)  Deputy Steinmetz refused to allow Henry to approach his brother.  While Chester sat in the cab of his pickup, Sergeant Kelley directed

---

[1]Deputy Steinmetz married at some point between December 7, 2000, and her deposition.  Her name is now Danielle Imboden.

Deputies Paul Reavis and R. L. McNannay to take up a position on a hill which is located just south of where the pickup was parked. Deputy Reavis was armed with a rifle; Deputy McNannay was armed with a pistol. It is unlikely Chester could see them. As the standoff continued, he began a countdown. He said that in nine minutes "it would be over." (Imboden Deposition, at 37.) Deputy Steinmetz tried to persuade him to abandon the countdown. During her deposition, she reviewed the report she wrote concerning the incident. It states in part, "Henry pleaded with Chester not to hurt anyone, that it wasn't fair to the cops." Her report goes on to state, "[Chester] responded that he didn't want to hurt anyone, just himself[.]" *Id.* at 37-38. Eventually, Chester emerged from the cab of his pickup armed with a handgun. He was illuminated by multiple lights. Officer Grant began "hollering," then "screaming," at Chester to put his handgun down and not to shoot. (Deposition of Morgan Grant, at 54-55.) Chester did not put his handgun down. Instead, he climbed into the bed of the pickup, where he stood holding the handgun by his side. A number of officers were situated west of his pickup. Many of them were in vulnerable positions. Sheriff Tomson, Sergeant Kelley, and Deputy McNannay testified during their depositions that Chester threatened to shoot. Henry was sitting in a police vehicle; he was close to where Sergeant Kelly stood. During his deposition, Henry seemed to acknowledge Chester yelled something at the officers -- thinking perhaps he said, "Get back" -- but Henry could not recall exactly

ORDER - 3

what Chester said.  (Hunt Deposition, at 50.)  By contrast, Henry testified unequivocally that he watched Chester as he stood in the bed of the pickup and that he did not see Chester raise the handgun. At least five officers disagree with Henry's testimony.  Sheriff Tomson, Sergeant Kelley, Deputy Reavis, Deputy McNannay, and Officer Grant testified that Chester pointed his pistol in a manner that threatened officers who were located to the west of the pickup. Consequently, Sergeant Kelley, Deputy Reavis, and Deputy McNannay opened fire.  Deputy Reavis hit Chester in the right side.  He died at a local hospital later that evening.

Mr. Hunt is survived by his wife, Heather Hunt, and by their daughter, Faith Hunt.  Mrs. Hunt filed this action in her dual capacity as the personal representative of Chester's estate and as the mother of their minor daughter.  She alleges Sergeant Kelley, Deputy Reavis, Deputy McNannay, and Sheriff Tomson violated the Fourth Amendment by employing excessive force against Mr. Hunt.  In addition, she alleges they violated the Fourteenth Amendment by depriving her and her daughter of their respective liberty interests in a relationship with him.  Finally, she alleges Whitman County has a policy of failing to train its deputies and a policy of authorizing them to use excessive force.  She seeks compensatory and punitive damages pursuant to 42 U.S.C. § 1983.  The Court has original jurisdiction over Mrs. Hunt's claims.  28 U.S.C. §§ 1331, 1343.

The defendants move for summary judgment.  In evaluating their

motion, the Court must view the evidence in the light most favorable to the plaintiff. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). Summary judgment is appropriate only if "there is no genuine issue as to any material fact and [the defendants are] entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one "that might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact may be considered disputed if the evidence is such that a jury could find that the fact either existed or did not exist. *See id.* at 249, 106 S.Ct. at 2511 ("all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury . . . to resolve the parties' differing versions of the truth" (quoting *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288-89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968))). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2511.

## II.

The individual defendants seek qualified immunity from damages. As a result, the Court must conduct at least one, and perhaps two, inquiries. *Saucier*, 533 U.S. at 201, 121 S.Ct. at 2156. The first inquiry is whether they violated the Fourth Amendment by employing deadly force against Chester Hunt. *See id.* If a reasonable jury

ORDER - 5

could not find for the plaintiffs on this issue, the defendants are entitled to summary judgment.  No further inquiry is needed.  *Id.* Conversely, if a reasonable jury could find that the individual defendants employed deadly force in an unconstitutional manner, a second inquiry is needed.  *Id.*  It is whether, on December 7, 2000, Mr. Hunt's right to be free from deadly force was clearly established under the Fourth Amendment.  *See id.*

### (A)

Under the Fourth Amendment, it is reasonable for an officer to employ deadly force if he has probable cause to believe that the person at whom he is shooting poses a threat of serious physical harm to himself or others.  *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985) (hereinafter "*Garner*").  Whether the force that the officer employed was reasonable depends upon the totality of the circumstances.  By way of illustration only, these include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).  The circumstances confronting the officer are not to be viewed from the unhurried perspective conferred by 20/20 hindsight.  *See id.*  Rather, the circumstances are to be viewed from the perspective of a reasonable officer on the scene.  *Id.*  Moreover, the Court must make due "allowance for the

fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Id.* at 397, 109 S.Ct. at 1872.

### (B)

It is undisputed that Chester Hunt was emotionally distraught and had been drinking. Other than (perhaps) driving under the influence, he had committed no crime that afternoon prior to the officers' arrival. Nor was he known to be a violent person. Nevertheless, he pointed a handgun at Officer Grant when Grant first contacted him.

It is undisputed that Chester Hunt's actions and words were ambivalent. At times, he seemed to be seeking a peaceful resolution of the crisis. For example, he relinquished a handgun at the request of the officers and, according to Henry Hunt, begged Henry to "come get him." At other times, however, Chester seemed to be contemplating a violent and self-destructive conclusion. For example, he asked Officer Grant what would happen if he came out shooting. (He was warned he would be shot.) Later, he began a countdown, hinting ominously that "it would be over" in nine minutes. During the countdown, he indicated he didn't want to hurt anyone other than himself.

It is undisputed that, at some point after beginning the countdown, Chester Hunt emerged from the cab armed with a handgun and

climbed into the bed of the pickup.  Officer Grant testified that he

began hollering, then screaming, at Chester to put his handgun down

and not to shoot.  Beyond this, there is little agreement with

respect to what occurred after Chester emerged from the cab.

Sheriff Tomson, Sergeant Kelley, and Deputy McNannay  testified

at their respective depositions that, after Chester emerged from the

cab, they heard him say he intended to shoot.  Sheriff Tomson

testified:

> Q.   Did you ever hear him threaten to hurt anyone else?
> A.   Yes.
> Q.   When was that?
> A.   When he gave the warning and said he was coming out, he
>      made threats that he was coming out shooting and that he
>      was going to -- I don't remember his specific wording [--]
>      but the gist of it was he was going to come out and . . .
>      he was going to essentially kill off -- take officers and
>      kill officers, he was going to attack officers.

(Deposition of Steve Tomson, at 93.)  Deputy McNannay testified in

part:

> I remember the sheriff saying -- it was either, "I'm going
> to take -- " I believe he said, "I'm going to take him with
> a 37,[2]" and then Chester replied, "You're not going to
> shoot me.  I'm going to shoot all of you."

(Deposition of R. L. McNannay, at 41.)  Sergeant Kelley testified:

> A.   As he raised the weapon up I heard sets of words.  I heard
>      shoot me.  And I'm yelling, no.  At the same time I believe
>      as I yell no he says, I'll shoot you.  And then I heard the
>      words mother fucker.  So shoot me.  I'm yelling, no.  I'll
>      shoot you.  Mother fucker.  Okay.  I know he said the first
>      two and my mind I thought he said the third.  Best of my

---

[2]Deputy McNannay seems to be referring to a 37mm launcher.
This weapon fires projectiles that are designed to temporarily
disable a person rather than kill him.

```
            memory I mean it could have been Steve, as I'm discharging
            rounds and he's running off to the right he may have said
            it, I don't know.  I can't tell you.
      Q.    So you are not sure who said mother fucker?
      A.    It seems to me like it was Mr. Hunt.
      Q.    Okay.
      A.    Best of my memory seems like it was Mr. Hunt.
```

(Deposition of Patrick Kelley, at 48.[3])  The plaintiff argues that

the testimony quoted above is inconsistent with testimony given by

Deputy Steinmetz at her deposition.  She testified that she didn't

remember whether Chester said "anything about killing a cop while

[she was] at the car with Henry [Hunt.]"  (Imboden Deposition, at

78.)  In response to additional questioning, she conceded that her

report does not contain a reference to a threat.  *Id.*  Her concession

might be significant had she been located in a place where she would

have heard a threat had Chester made one, but the record is unclear.

Her testimony strongly implies she was sitting in a police vehicle

with Henry Hunt.  At his deposition, he was asked:

```
      Q.    [D]id you . . . hear Chester . . . threatening the
            officers?
      A.    I don't recall.  I think he was yelling "get back" or
            something like that.
      Q.    But you don't recall?
      A.    No.  Verbatim, no.
```

(Hunt Deposition, at 50.)  Henry's testimony partially corroborates

and partially contradicts the officers' testimony.  While he

acknowledges that Chester yelled at the officers, he recalls Chester

saying no more than, "Get back."  However, his testimony contains an

---

[3]The transcript of Patrick Kelley's deposition contains only
the punctuation quoted above.

ORDER - 9

element of uncertainty.  He conceded he could not recall with precision exactly what Chester said.  This limits the probative value of his testimony.  *See Blanford v. Sacramento County*, 406 F.3d 1110, 1113 n.3 (9th Cir.2005).  Which is not to say the Court may accept the officers' accounts.  Before doing so, the Court must consider whether they are consistent.  *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.1994), *cert. denied*, 515 U.S. 1159, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995).  As the record now stands, it is unclear whether the officers are describing the same statement or different statements.  If they are describing the same statement, their accounts diverge dramatically.  If they are describing different statements, the inconsistency in their accounts may be more apparent than real.  Either way, this is not the sort of dispute the Court may resolve under Rule 56.

Another issue is whether the deputies have accurately described the direction Mr. Hunt was facing when he was shot.  A number of then have indicated he was facing Deputies Reavis and McNannay (*i.e.*, he was facing south) and that he pointed his handgun toward Sergeant Kelley (*i.e.*, he pointed it west).  The plaintiff challenges this testimony.  She has submitted an affidavit from D. P. Van Blaricom, a former chief of police who has reviewed the police reports and autopsy findings at the plaintiff's request.  Mr. Van Blaricom does not believe Mr. Hunt was facing Deputies Reavis and McNannay when Sergeant Kelley began firing.  To the contrary, Mr. Van Blaricom

believes his back was turned toward Sergeant Kelley.  However, his opinion appears to be inconsistent with testimony provided by Henry Hunt.  The latter was close to where Sergeant Kelley stood when Kelley began shooting.  "[L]iterally feet away from me were guns going off.  I was so close I could see the rim fire."  (Hunt Deposition, at 41.)  Thus, Sergeant Kelley's view of Chester must have been similar -- not necessarily identical, but similar -- to Henry's view at that point.  Concerning Chester, Henry was asked:

> Q.  Do you recall seeing which way Chester was facing when he was shot?
> A.  Yes.
> Q.  Was he facing --
> A.  Me.  Well, he wasn't directly facing me, he was kind of at a -- it would be a northeast angle.  **But his back wasn't towards me or anything.**
> . . . .
> Q.  Can you estimate how many degrees your brother was turned away from you?  I mean I know you said northwest, but **could you see his face?**
> A.  **Yes, kind of side of his face.**
> Q.  Do you know what he was looking at?
> A.  I don't know what he was looking at, I would assume the police.

*Id.* at 79-80 (emphasis added).  If Chester's back was not turned toward Henry, presumably it was not turned toward Sergeant Kelley.  If Henry could "kind of" see the "side of [Chester's] face," presumably Sergeant Kelley could "kind of" see it as well.  Consequently, assuming a jury credits Henry's testimony, it is difficult to see how the jury could agree with Mr. Van Blaricom's assertion that Chester had turned his back toward Sergeant Kelley before he began shooting.

ORDER - 11

A third issue arises from conflicting testimony concerning the manner in which Chester handled his handgun after he climbed into the bed of the pickup.  As explained above, Henry was sitting in a police vehicle near where Sergeant Kelley was standing.  Although Henry may not have been able to hear what Chester said (at least not very well), Henry insists he had an unobstructed view of Chester as he stood in the bed of the pickup.  Henry adamantly denies Chester raised his handgun, much less pointed it at anyone.  If the jury credits Henry's testimony (and the Court must assume it will), the jury could find that the deputies' account of the manner in which Chester handled his handgun is inaccurate.

### (C)

The officers made sure Chester Hunt could not drive away in his pickup.  He never attempted to flee on foot.  Since he was effectively contained in an isolated area, he did not pose a risk to the public at large.  However, he did pose a risk to the officers.  Early in the standoff, he demonstrated his potential dangerousness by pointing a handgun at Officer Grant.

The officers recognized that Mr. Hunt was emotionally distraught.  *See Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir.2001) ("where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed").  The officers attempted to

negotiate a peaceful resolution of the crisis; but they were not obligated to accept surrender on Mr. Hunt's terms.  His moods changed rapidly.  They could not be sure how he would react if his brother and a deputy approached him.  An objective officer reasonably could have feared he would open fire.

Unlike *Deorle*, the deputies kept their distance from Mr. Hunt. 272 F.3d at 1283.  They were content to let him sit in the cab of his pickup, although they did warn him that if he came out shooting he would be shot.  *Cf. id.* at 1283-84 ("The absence of a warning or an order to halt is also a factor that influences our decision.").  It was Mr. Hunt, not the deputies, who escalated the crisis by commencing a countdown.  Deputy Steinmetz recognized the danger posed by the countdown and attempted to dissuade him from completing it. Apparently, she was unsuccessful.  Mr. Hunt then further escalated the crisis by getting out of the cab with a firearm in hand and ready for use.  This dramatically reduced the margin of error.

Of course, the mere fact that Mr. Hunt was armed and had previously pointed his handgun at Officer Grant did not justify shooting him.  *See Harris v. Roderick*, 126 F.3d 1189, 1203 (9th Cir.1997), *cert. denied sub nom. Smith v. Harris*, 522 U.S. 1115, 118 S.Ct. 1051, 140 L.Ed.2d 114 (1998).  But unlike Mr. Harris, Mr. Hunt was not retreating.  He emerged from the cab of his pickup after a countdown which an objective law enforcement officer reasonably could have construed as a prelude to violence.  He ignored Officer Grant's

ORDER - 13

repeated exhortations to put his handgun down.  In order to shoot,
all Mr. Hunt had to do was lift the firearm and squeeze the trigger.
He would have been able to fire one or more shots before the officers
had time to react.  This much is undisputed.  Beyond this, there is
testimony that Mr. Hunt verbally threatened to shoot and that he
pointed his handgun in the direction of officers who were located to
the west of his pickup.  If this testimony is accurate, Mr. Hunt
clearly posed an immediate threat of serious physical harm to the
officers.  Deadly force was justified.  *Cf. Scott*, 39 F.3d at 915-16
(officer properly shot a man who pointed a firearm at he and a fellow
officer).  However, given the posture of the case, the Court must
assume that Mr. Hunt said nothing more menacing than, "Get back," and
that he did not point his handgun at anyone.  Did he, then, pose an
immediate threat of serious physical harm?  A strong argument can be
made that where, as here, an armed and emotionally unstable man
disobeys commands to disarm and surrender, and where he behaves in a
manner that indicates he is contemplating a violent resolution of the
crisis, a reasonable law enforcement officer need not refrain from
shooting until the man "has drawn a bead on the officer or others[.]"
*Montoute v. Carr*, 114 F.3d 181, 185 (11th Cir.1997).[4]  However, this
is not the only reasonable interpretation of Chester Hunt's actions

---

[4]This case is neither precedent nor directly on point.  Mr.
Montoute was fleeing with a sawed-off shotgun when the officer
fired.  114 F.3d at 182-83.

ORDER - 14

as he stood in the bed of the pickup.  If Henry's recollection of the incident is accurate, Chester was not attempting to escape.  He was not verbally threatening the officers, and he was not pointing his handgun at them.  To that extent, *Blanford* is distinguishable.  406 F.3d at 1116 ([Mr. Blanford "was armed, refused to give up his weapon, was not surrounded, and was trying to get inside a private residence or in default of that, into the back yard, where his sword could inflict injury that the deputies would not then be in a position to prevent").  Consequently, an equally strong argument can be made that, at the time the officers began shooting, Mr. Hunt did not pose a threat of serious physical harm -- at least not an immediate threat.  Only a jury can decide which of the two competing arguments is most persuasive.

**(D)**

Even though a jury question exists with respect to whether the deputies violated the Fourth Amendment by opening fire, they are entitled to qualified immunity unless Mr. Hunt's right to be free from deadly force was clearly established on December 7, 2000.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156.  In order to properly conduct the inquiry, it is necessary to describe the situation confronting the officers with some particularity.  *See*

ORDER - 15

*Brosseau v. Haugen*, 543 U.S. 194, 198-200, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004) (*per curiam*).  For example, Officer Brosseau had to decide "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight."  *Id.* at 200, 125 S.Ct. at 600.

The plaintiff characterizes this as a case in which the deputies shot an emotionally distraught man who, although armed, had not committed a serious crime prior to their arrival, was not attempting to flee, and who had turned his back toward the deputies whom he allegedly was threatening.  According to the plaintiff, law enforcement officers have been on notice since *Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir.1991), that they may not shoot a man who is armed but not pointing his gun at them.  There is some support for this interpretation of *Curnow*.  *Haugen v. Brosseau*, 351 F.3d 372, 381-82 (9th Cir.2003) (as amended), *rev'd*, 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004).  However, as the Ninth Circuit and other courts have noted, this interpretation is not supported by the record.  *See, e.g., Blanford*, 406 F.3d at 1118-19.  Mr. Curnow's girlfriend said that:

> [He] . . . was not hitting her but was simply holding her in his lap.  She said that Curnow did not reach for his gun before the police shot him, and that it appeared Curnow had been shot in the back by the first shot.  She further stated that the gun was unloaded and that he grabbed it by the muzzle as he attempted to flee the residence.

952 F.2d at 323.  Based upon this statement, a reasonable jury

arguably could have found that the officer shot an unarmed man in the back despite the fact he was doing nothing more threatening than holding his girlfriend on his lap.  Clearly, then, *Curnow* is distinguishable from this case; and, as explained above, so are *Deorle* and *Harris*.  Significantly, the plaintiff has failed to cite a single case, much less a case decided before December 7, 2000, in which a law enforcement officer has been held to violate the Fourth Amendment by shooting an armed man who is aware of the officer's presence, who is capable of shooting the officer, who has ignored repeated instructions to put his firearm down, and who has given credible indications that he is contemplating a violent resolution of the standoff.  As a result, it would **not** have been clear to a reasonable law enforcement officer that it was unlawful to shoot Chester Hunt even assuming he did not verbally threaten the officers or point his handgun at them as he stood in the bed of the pickup.  Rather, this is a situation in which, even if the plaintiff's account is correct, the officers' decision to shoot fell within the hazy border between "'excessive and acceptable force.'"  *Brosseau*, 543 U.S. at 201, 125 S.Ct. at 600 (quoting *Saucier*, 533 U.S. at 206, 121 S.Ct. at 2158).  Thus, Deputy Reavis, Sergeant Kelley, and Deputy McNannay are entitled to qualified immunity.[5]

_____

[5]Gregory Russell, Ph.D., is an associate professor of criminology at Arkansas State University.  As explained below, he believes the deputies' conduct violated nationally accepted standards of policing.  However, there is no indication that the

**(E)**

The plaintiff seeks to hold Sheriff Tomson liable under a theory of supervisory liability. *See, e.g., Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir.1998) ("If Officer Chew used excessive force, then Chief Samuels' liability hinges on whether he 'set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury.'" (*quoting Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir.1991))). A number of circuits have held that a supervisor is entitled to qualified immunity unless, at a minimum, his subordinate's actions violated clearly established law. *See, e.g., Poe v. Leonard*, 282 F.3d 123, 126, 134-35 (2d Cir.2002); *Camilo-Robles v. Hoyos*, 151 F.3d 1, 6 (1st Cir.1998). While the Ninth Circuit has decided that a supervisor is not entitled to qualified immunity where a jury issue exists with respect to whether his subordinate violated clearly established law, *Watkins*, 145 F.3d at 1093, the Ninth Circuit does not appear to have decided whether a supervisor is entitled to qualified immunity where, as here, his subordinates did not violate clearly established law. Nevertheless,

standards described by Dr. Russell have been adopted by the Legislature of the State of Washington, by any administrative agency having authority to regulate police practices in this state, or by the Washington Supreme Court. As a result, these standards are irrelevant with respect to whether the deputies are entitled to qualified immunity. *See Poe v. Leonard*, 282 F.3d 123, 145-46 (2d Cir.2002).

ORDER - 18

there is every reason to think the Ninth Circuit will follow its sister circuits' lead.  One of the objectives of the qualified-immunity doctrine is to enable public servants to effectively perform their duties by freeing them from the fear of harassing litigation. *Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984).  This objective can be accomplished only if public servants "reasonably can anticipate when their conduct may give rise to liability for damages[.]"  *Id.*  As other circuits have recognized, granting a supervisor qualified immunity when his subordinate has not violated clearly established law "comports with [this] core principle of qualified immunity by protecting supervisory officials from suit when they could not reasonably anticipate liability." *Camilo-Robles*, 151 F.3d at 6.  Assuming, then, that the Ninth Circuit will follow its sister circuits' lead, Sheriff Tomson is entitled to qualified immunity because Deputy Reavis, Sergeant Kelley, and Deputy McNannay did not violate clearly established law.

### III.

The plaintiff seeks to hold Whitman County liable under § 1983 for Chester Hunt's death.  The plaintiff may not recover on a theory of *respondeat superior*.  *Monell v. Department of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978).  Instead, "recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' -- that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. City*

ORDER - 19

*of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986).

### (A)

The plaintiff alleges that Whitman County authorized the deputies to employ excessive force against Mr. Hunt.  In order to hold the County liable under this theory, the plaintiff must prove: (1) Chester Hunt was deprived of his right to be free from excessive force; (2) the County had a policy authorizing its deputies to use excessive force; (3) the County's policy amounted to deliberate indifference to Mr. Hunt's right to be free from excessive force; and (4) the County's policy was the moving force behind the constitutional violation.  *See Mabe v. San Bernardino County, Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir.2001); *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir.1996).  Of the four elements, the County focuses upon the second.  According to the County, the plaintiff cannot prove the existence of a policy authorizing deputies to use excessive force.

There are three methods by which the plaintiff can prove the existence of a policy.  First, she may show that the deputies acted pursuant to "a formal governmental policy or a longstanding practice or custom which constitutes the [towns'] standard operating procedure[.]"  *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir.1992) (internal punctuation and citations omitted), *cert. denied*, 510 U.S. 932, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993).  Second, she may

"establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy." *Id.* (internal punctuation and citations omitted). Third, she may "prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Id.* at 1346-47 (citations omitted).

The County does not have a policy formally authorizing the use of excessive force. To the contrary, a Sheriff had adopted a policy that places limits on deputies' use of force which, the plaintiff seems to concede, are formally consistent with the Fourth Amendment. The plaintiff alleges, nonetheless, that deputies customarily use force in a manner that is inconsistent with the Sheriff's formal policy. As authority for this allegation, she has provided an affidavit from Gregory Russell, Ph.D. *See infra* p. 17 n. 5. He claims Sheriff Tomson allowed deputies to use excessive force against intoxicated students as the deputies attempted to quell a riot that occurred at Washington State University during May of 1998. Dr. Russell's opinion is based upon hearsay for which no exception to the hearsay rule is obvious. While an expert may rely upon inadmissible evidence in forming an opinion if experts in the field reasonably rely upon this type of evidence, Fed.R.Evid. 703, the plaintiff has not established that experts in the field of police practices reasonably rely upon the evidence he did. For example, he concedes

he is relying, in part, upon statements he overheard in a gymnasium. (Deposition of Gregory Russell dated November 17, 2005, at 76-77.) Moreover, even if Dr. Russell's opinion is admissible, the plaintiff has established that Whitman County deputies engaged in, at most, one instance of excessive force prior to December 7, 2000. A total of two instances of excessive force is not enough to establish a longstanding practice or custom. *See Meehan v. County of Los Angeles*, 856 F.2d 102, 107 (9th Cir.1988).

This conclusion does not necessarily preclude the existence of a policy. It seems likely that Sheriff Tomson is a final policymaker for Whitman County. *Cf. McMillian v. Monroe County*, 520 U.S. 781, 785-86, 117 S.Ct. 1734, 1737, 138 L.Ed.2d 1 (1997) (state law governs whether a county sheriff represents the state or the county when acting in the capacity of a law enforcement officer); *Davis v. Mason County*, 927 F.2d 1473, 1480-81 (9th Cir.1991) (in the State of Washington, a county sheriff is a final policymaker with respect to his deputies' training). A County may be held "liable for an isolated constitutional violation if [a] final policymaker [ratifies] a subordinate's actions." *Christie v. Iopa*, 176 F.3d 1231, 1238 (9th Cir.) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988) (plurality opinion)), *cert. denied*, 528 U.S. 928, 120 S.Ct. 324, 145 L.Ed.2d 253 (1999). However, the final policymaker "must have knowledge of the constitutional violation and actually approve of it." *Lytle v. Carl*,

382 F.3d 978, 987 (9th Cir.2004).  In *Christie*, the Ninth Circuit held that a jury issue existed with respect to ratification where the plaintiff had produced evidence sufficient to permit a fact-finder to conclude that a county prosecutor affirmatively approved his deputy's alleged ongoing constitutional violations.  176 F.3d at 1240.  In view of the preceding authorities, the plaintiff may create a jury issue with respect to ratification by offering evidence from which a reasonable jury could find that Sheriff Tomson knew of the specific circumstances in which his deputies used deadly force and that he approved of their respective decisions to use it in those circumstances.  She has done so.  The record reflects that Sheriff Tomson arrived on the scene well before his deputies opened fire.  Although he delegated much of the minute-to-minute decision-making to Sergeant Kelley, he kept abreast of the decisions Sergeant Kelley was making and did not expressly overrule any.  Sheriff Tomson was near Sergeant Kelley when Kelley, Reavis and McNannay began shooting.  Consequently, he was an eye-witness to their use of deadly force.  He has never questioned their respective decisions to open fire.  To the contrary, he has consistently affirmed that Mr. Hunt posed an immediate threat of serious harm and that his deputies were justified in shooting.  Given Sheriff Tomson's intimate familiarity with his deputies' use of deadly force, given his failure to take disciplinary action, and given his unswerving affirmation of the legitimacy of his deputies' actions, a reasonable jury could find that he ratified

their actions in his capacity as the County's final policymaker with respect to the use of deadly force.  Whether the deputies actually behaved in an unreasonable manner is a separate issue; one the jury must resolve.  However, if the jury finds that the deputies' use of deadly force was unreasonable, the jury also could find that the deputies' actions are properly chargeable to the County as County policy.

**(B)**

The plaintiff alleges that Sheriff Tomson failed to provide his deputies with adequate training regarding the use of deadly force. If Sheriff Tomson, in his capacity as the County's final policymaker regarding training, was deliberately indifferent to his deputies' need for more or different training with respect to the use of deadly force, his indifference may constitute County policy. *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989).  Under *Canton*, the focus is on the adequacy of the Sheriff's training program in relation to the tasks his deputies were expected to perform as of December 7, 2000.  *Id.* at 390, 109 S.Ct. at 1206. Since the focus is on the training program, the plaintiff must describe the program in detail and explain why it was so inadequate that it reflects deliberate indifference on the part of Sheriff Tomson to Mr. Hunt's right to be free from excessive force.  This is something the plaintiff has failed to do.  Nowhere in her statements of material fact or her memoranda has she provided a detailed

description of the content of the training that the deputies received

concerning the use of deadly force.  This seriously undermines her

failure-to-train theory.  Unless the fact-finder has a clear

understanding of the training that the deputies actually received,

the fact-finder cannot assess the adequacy of the program.  This

weakness in the plaintiff's case is intensified by undisputed

evidence that the deputies were familiar with the *Garner* standard.[6]

Deputy Reavis was asked:

> Q.    Based on your training, what would the situation need to be
>       before you felt it was appropriate to take a shot?
> A.    If others or myself are in imminent danger.

(Deposition of Paul Reavis, at 37.[7])  In *Merritt v. County of Los*

*Angeles*, 875 F.2d 765, 770-71 (9th Cir.1989), the Ninth Circuit

upheld the trial judge's decision to grant judgment notwithstanding

the verdict on the plaintiff's allegation of inadequate training

where he "did not present any evidence indicating that the sheriff's

department's training program regarding the use of force was in any

way inadequate[,]" and the "evidence presented at trial clearly and

unequivocally established that the training was extensive and

comprehensive."  In this case, the only training that the plaintiff

describes in detail is training that occurred earlier on December

7th.  The deputies participated in an exercise that was designed to

---

[6]*See infra* p. 6.

[7]The testimony of Deputy McNannay is in accord.  (McNannay
Deposition, at 42.)

ORDER - 25

enable them to react to an armed aggressor.  The plaintiff alleges that this training hindered the deputies' ability to respond patiently to Mr. Hunt.  At most, however, this allegation establishes negligence, which falls well short of deliberate indifference.  *See Canton*, 489 U.S. at 391, 109 S.Ct. at 1206 ("Neither will it suffice to prove that an injury . . . could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.").  Absent evidence that Sheriff Tomson knew he was creating an unjustified risk of excessive force and deliberately ignored the risk, the plaintiff's failure-to-train theory cannot succeed.  *See Mateyko v. Felix*, 924 F.2d 824, 826 (9th Cir.1990).

**IV.**

Dr. Russell believes the deputies should have employed different tactics and tried to subdue Mr. Hunt with less-than-lethal force. According to Dr. Russell, the deputies' acts and omissions violated departmental policies and nationally recognized standards of policing.  (Affidavit of Dr. Gregory Russell, ¶ 8, at 9-11.)  This testimony is admissible under Federal Rule of Evidence 702 only if it will "assist the trier of fact."  The plaintiff submits the deputies' failure to adhere to departmental policies and nationally recognized standards of policing "enabled, or encouraged, the violation of [Mr. Hunt's] Constitutional rights by having untrained personnel in a situation they were not properly trained to deal with and which they

responded to inappropriately." (Plaintiffs' Supplemental Memorandum in Opposition to Defendants' Motion to Strike Affidavit, at 7.[8])  In other words, the plaintiff seems to be attempting to establish a Fourth Amendment violation by offering evidence that the deputies utilized bad tactics which resulted in a deadly outcome that could have been avoided.  *See Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir.2002).  If this is the purpose for which the plaintiff is offering the testimony summarized in paragraph 8 of Dr. Russell's affidavit, it will not assist the jury:

> [T]he fact that an officer negligently gets himself into a dangerous situation will not make it unreasonable for him to use force to defend himself.  The Fourth Amendment's "reasonableness" standard is not the same as the standard of "reasonable care" under tort law, and negligent acts do not incur constitutional liability.  An officer may fail to exercise "reasonable care" as a matter of tort law yet still be a constitutionally "reasonable" officer.

*Id.* (citations omitted).  Even if the disputed testimony does more than suggest mere negligence, there is a second reason why it will not assist the jury.  The events that will most affect the outcome of this case are those which occurred while Mr. Hunt was standing in the bed of his pickup; in particular, whether he threatened to shoot the officers and whether he pointed his handgun at them.  The testimony summarized in paragraph 8 of Dr. Russell's affidavit does not address these disputes.  Not only that, but they are well within "lay

---

[8]While this specific statement was made in response to the defendants' challenge to the admissibility of sections (c), (d), and (j) of paragraph 8, it fairly represents the plaintiff's position with respect to the entirety of paragraph 8.

ORDER - 27

competence." *Pena v. Leombruni*, 200 F.3d 1031, 1035 (7th Cir.1999) (trial judge properly excluded expert testimony in an excessive-force case where the issue was whether the danger posed by a mentally disordered person "was sufficiently lethal and imminent to justify the use of deadly force"). Here, as in *Pena*, the jury does not need "specialized knowledge" to decide whether Mr. Hunt threatened to shoot or whether he pointed his handgun. Consequently, the testimony summarized in paragraph 8 is inadmissible. Fed.R.Evid. 702. Which is not to say that expert testimony will never be of assistance in an excessive-force case. The Sixth Circuit has held that a trial judge did not abuse his discretion by admitting expert testimony regarding the force employed by police officers after they had handcuffed and hobbled a mentally retarded man. *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 907-09 (6th Cir.2004), *cert. denied*, 544 U.S. 975, 125 S.Ct. 1837, 161 L.Ed.2d 725 (2005). In such a case, lay people may have had difficulty determining objective reasonableness without specialized knowledge concerning proper techniques for responding to a person who continues to struggle after physical restraints have been applied. Not so, here. Whether Mr. Hunt posed an immediate threat of serious harm to the officers as he stood in the bed of his pickup is precisely the sort of issue that lay people are equipped to resolve.

## V.

In conclusion, genuine issues of material fact exist concerning

whether Deputy Reavis', Sergeant Kelley's, and Deputy McNannay's respective decisions to shoot at Chester Hunt were reasonable under the totality of the circumstances.  Also, genuine issues of material fact exist concerning whether Sheriff Tomson ratified their conduct in his capacity as Whitman County's final policymaker with respect to the use of deadly force.  To that extent, the defendants' motion for summary judgment is denied.  A jury trial will be scheduled.  The testimony summarized in paragraph 8 of Dr. Russell's affidavit will not be admitted at trial.  The Court reserves ruling with respect to whether the plaintiff has presented evidence sufficient to avoid summary judgment on her and her daughter's claims that the defendants violated the Fourteenth Amendment by depriving them of their respective liberty interests in a relationship with Chester Hunt. The Court also reserves ruling with respect to whether the plaintiff has presented evidence sufficient to avoid summary judgment on her request for punitive damages.  Additional memoranda may be helpful. Deputy Reavis, Sergeant Kelley, Deputy McNannay, and Sheriff Tomson are entitled to qualified immunity from damages based upon the plaintiff's allegation that they violated the Fourth Amendment.  In light of the plaintiff's concession that Chester Hunt's race played no role in the defendants' actions, the Court will dismiss her claim for damages under § 1983 to the extent it involves an allegation that the defendants violated the Equal Protection Clause of the Fourteenth Amendment.  Similarly, the Court will dismiss her claim for damages

under § 1985.

**IT IS HEREBY ORDERED:**

1. The defendants' motion for summary judgment (**Ct. Rec. 32**) is granted in part:

(a) Paul Reavis, Patrick J. Kelley, R. L. McNannay, and Steve Tomson are granted qualified immunity from damages to the extent the plaintiff alleges they violated the Fourth Amendment;

(b) the plaintiff's claim for damages under 42 U.S.C. § 1983 is dismissed with prejudice to the extent it is based upon an allegation that the defendants violated the Equal Protection Clause of the Fourteenth Amendment; and

(c) the plaintiff's claim for damages under 42 U.S.C. § 1985 is dismissed with prejudice.

2. The defendants' motion to strike and/or exclude expert testimony (**Ct. Rec. 26**) is granted in part.

3. The defendants' motion to strike and/or exclude expert testimony (**Ct. Rec. 89**) is granted in part.  The testimony summarized in paragraph 8 of Dr. Russell's affidavit will not be admitted at trial.

4. Counsel are to jointly contact the Court's staff and arrange a scheduling conference.  At the scheduling conference, counsel shall be prepared to discuss whether the parties intend to participate in mediation and whether they desire the assistance of a magistrate judge.

ORDER - 30

5. Within 14 days, the plaintiff shall file an amended complaint that omits any reference to "John Doe" defendants.

**IT IS SO ORDERED.**  The District Court Executive is hereby directed to enter this order and furnish copies to counsel.

**DATED** this __26th__ day of July, 2006.

___s/Fred Van Sickle___
Fred Van Sickle
United States District Judge

ORDER - 31